The next case is Just Play v. Fitzmark. Elizabeth Ashley Painter is here for the appellate. Fitzmark, Melissa Pellet-Vasquez is here for the appellee. Just Play, Ms. Painter, you may begin when you're ready. Good morning, Your Honors. Ashley Painter for Fitzmark, Inc. We're here today because Judge Cannon committed reversible error when she denied Fitzmark's Article 50 motion and permitted the jury to decide this case. As a matter of law, Just Play accepted Fitzmark's May 2, 2018 offer by tendering goods to Fitzmark's warehouse on October 18, 2018. Just Play doesn't dispute that the acceptance by tender provision is enforceable, nor could it because they're so common in the warehousing industry that they appear in model warehouse agreements across the United States, including in Florida. Just Play's argument, rather, is that it rejected the May 2, 2018 offer, but that finds no home in the record. First, there's no direct evidence of rejection, none. Second, there's no circumstantial evidence that would support an inference that Just Play would. You said there's no direct evidence, and I think that's correct from what I've seen, but they didn't sign the rate sheet, and they didn't return it, so that Fitzmark's representative was still asking for the signed rate sheet to be submitted after the goods were first delivered, right? And I think it was, was it Mr. Carter who said, you know, go ahead and fill up your space, first come, first serve, you're my recommended warehouse, but I haven't been able to get my boss to go along yet. Yeah, so the timeline's important here. The communication that you just referenced occurred in May of 2018, certainly isn't a circumstantial, it's not, it does not permit an inference that that was rejected, because he says, go ahead. When were the goods first delivered? October 18, 2018. That's months later. I understand. The contract, though, excuse me, the contract permits deposit months later, so long as Fitzmark accepts the goods. No matter what the length of time, so a year later? Yes, Your Honor. That rate sheet still would have been in existence? Yes. All right, tell me this, what amounts or rates did JustPay pay Fitzmark before the rates were changed early the following year? Well, Fitzmark actually didn't pay, I'm sorry, JustPay didn't actually pay its invoices until the end, which is why our client was able to assert a warehousing lien over. What were you, what were you billing at? We were, I don't believe anything was invoiced until January. I mean, you know, that creates all sorts of messy factual issues, because if you had, again, this is only my way of viewing the briefs and the little I've been able to see of the record, but if you had Fitzmark a month after the goods were first delivered sending an invoice with the rates that were set out in the May rate sheet, and there was no complaint by JustPay by the time before things went south, I can see your argument, like, okay, yeah, everything's good, and the May rate sheet holds everybody to its terms, but that's not what happened here, and then the rates get changed, and the lock gets changed. I have a question for your opponent on the lock, but it's just very, very messy, and to add to the mess, and then I'll let you talk, to add to the mess, when you tried to, the first time that your client tried to bring the May rate sheet into the case, the district court told you, no, you have to file a motion for leave to amend, and you never moved for leave, your client never moved for leave to amend, that creates more of a mess. Let me take apart what you just said, because there are, I think, about three points in there that need to be addressed. The first is the rate issue, so the contract, which you can find in the record, well, you can find it in the record sort of all over the place, but you can find it at ECF 217-45 at page four, and the first bullet point in the contract, it says, look, we're going to reevaluate this quarterly based on volume, and the parties can modify the rate structure according to volume, and that's exactly what happened. JustPlay reaches out to FITSMART and says, hey, our volume has increased, and actually, I think you've got the volume wrong. I think that you have recorded a lower volume than actually we have provided you, so we would like to reevaluate these rates, and FITSMART accommodated that. There's a side writing. It's an email that was exchanged, which you can find in the record at 214-44, so that's acting in conformance with the contract. As to your issue with the amendment, there was an affirmative defense in the answer that just referenced a written agreement. There was no need to specifically amend to include the May contract as part of the counterclaim, so we made a decision not to amend, but from a legal perspective, it doesn't matter because the affirmative defense in the district court recognized this when it reconsidered its summary judgment motion, just referenced a written agreement, at least one of the affirmative defenses, I think it was 14, just referenced a written agreement in and of itself. Let me explain why there's no inference that can be taken from the record that there was a rejection prior to tender. One . . . Could you address specifically Garula's, I'm probably not pronouncing that right, but his testimony as a he, I guess it's a he, his testimony? It is a he. Are you referring to the 30B6 testimony? Yeah, so I just, when reviewing the record, you know, he said at some point that during this process in May that JustPlay would not sign the agreement, and then he requested them back in October, he requested again a signature, some kind of signed copy. It just seems like, he also testified, I think in his deposition, that he did not think the May form governed the party's relationship, so that's what I mean, he just seems like it, his actions and his words suggest that the May form did not govern the relationship. Sure. So he testified that as of June, they had, well, as of May 15th, they had not yet reached an agreement. That's true. They didn't reach an agreement on, they were not told that JustPlay was going to proceed with Fitzmark until June, and then the party started to ramp up to work on the contract, which ultimately was formed by tender in October. He asked for another signed copy, he says in his email that he was cleaning up his file. So he says they reached an agreement in June, right, like you say? Yeah. But if they reached an agreement in June, how could the agreement be based on the May form? Based on the sending and the non-response to the May form? Well, there is a response to the May form, they deposit goods, but he's saying, we have now been authorized to go ahead with the proposal to start getting ready to do pre-formation activities to prepare the warehouse so that you can tender goods and we can provide you with those services. The October . . . According to Mr. Garula, what were the terms of the June agreement? They were the terms and services that were reduced to writing on the May 18th. That's the portion of the testimony that Judge Brasher is alluding to. There's a snippet of testimony where they show him the May agreement, the May rate sheet, and they ask him to discover the party's agreement and he says, I'm summarizing, no. So what do you do with that testimony? Right. If it wasn't a rate sheet, it wasn't a May rate sheet, then what was it? Mr. Garula was asked whether it was Fitzmark's contention that the May offer was what controlled. He said that it wasn't. There's no running away from that. That's what he said. How does that not create an issue of fact for a jury then? Because the existence of a written agreement, which Fitzmark has never varied on, and in fact, in that same deposition, Mr. Garula was asked, but you understood that JustPlay did not agree to the terms of the warehouse agreement, correct? Answer, no. Question, you didn't, you had a different understanding? Answer, by shipping product and they agreed to the terms of the agreement. That a lay witness got confused about a litigation position as to which of, which of several versions of an agreement that were passed back and forth during the negotiation process. There's no evidence in the record that Playmark has a corporate policy not to enter signed contracts? There's evidence in the record that JustPlay has a policy not to enter into written warehousing agreements. There is absolutely no evidence in the record, none, that they ever communicated that policy to my client, Fitzmark. Before shipping, before shipping the goods. Well, and, or after shipping the goods. So, I mean, my notes reflect that Dave Carter, JustPlay's director of operations, testified that he told Fitzmark several times, and his testimony was corroborated by Charlie Emby and Michael Borcher, that they don't enter into signed contracts. Is that not true? The, well, Mr. Borcher and Mr. Emby admit, and I think JustPlay will agree, they never spoke with Mr. Garola with respect to the contract formation. Dave Carter did testify that he said he wouldn't sign a written agreement. He never said that he told our client of a no written agreement policy. Your position is that there's a lot of evidence that there were a lot of discussions within JustPlay that they did not sign written warehousing agreements, but that that policy was never communicated to Fitzmark. That's correct. Yeah, and you can't, you can't have a secret, we don't sign or agree to written agreement policy in your mind and affect a rejection of a contract. You just, that's a lackluster law. One final question for you. I couldn't, I couldn't quite figure this out. When did the contract form? October 18th, 2018 when they shipped the goods in. Okay. And if I may. So Mr. Garula was wrong about the contract being agreed to in June? No, Mr. Garula said that the parties reached an agreement in June, but not that the contract was formed. But then how could that not be the one and the same thing? You can reach, you can reach an agreement and once you reach an agreement, you've got a contract. It may not be fully performed, but you've reached a contract. No different than if you had signed it. I don't understand. Well, if that's the case, then the written agreement, all the terms were reduced to writing in the agreement. And perhaps there was an oral communication that they were agreeing to the written terms. Why didn't Mr. Garula, forget the, forget the legal impact of his testimony. I understand your position that his testimony shouldn't determine anything conclusively, but from his perspective, from his lay perspective, why did he believe the parties had reached an agreement in June? Because that's when JustPlace said, run with it. We've decided that you are going to be our warehouse provider. And how did Fitzmark respond to that? By starting to prepare to perform. And not confirming that, what the terms were? Like, that's crazy. The terms had been reduced to writing, JustPlay had accepted, or had received those terms. They had been passed around. JustPlace is a sophisticated company. They have in-house counsel. Yeah. But I thought the rates, though, were not resolved until January. The rates were resolved prior to January. The rates changed in January due to a change in the volume. Okay. And if I may, I would like to point out, and I apologize, I don't recall who made this point, but the October 31st email, which sort of tells us everything that we need to know here, demonstrates that there was no communication prior to shipping in that JustPlay would not agree to a written contract with a warehousing provider. And if you'll permit me, I have just one more minute. In that email exchange, Tony Garola, or Fitzmark, is cleaning up his files. And he says, I also still need the warehouse agreement returned as well. If you recall, back in April, we changed the agreement per your request to lock the rates. It's from first receipt. So the rates are locked until 10-19. So in that moment, Mr. Garola recognizes the product's already been shipped in. It was shipped in 13 days ago from first receipt. That's when the rate lock takes place. That same day, JustPlay responds and says, can you please resend the agreement to ensure I have the correct one? So they know they're talking about a written agreement there. Can we sign after these first few test orders and start the clock then rather than now? Knowing that the rate lock triggered from shipment based on the written agreement, Tony says, OK, look, here, I'll give you a longer rate lock. I'm offering a modification to the agreement that has already been formed when they shipped in, just like how he testified in his 36 deposition. And they come back and say, I'm sorry. We have your argument. Thank you. Mm-hmm. Ms. Vazquez? Good morning, Your Honors. Melissa Pallette Vazquez on behalf of the appellee JustPlay. The appellate presents two issues. I think they're well formed. One relates to the failure to grant the Rule 50 motion by the district court, and one relates to the jury instructions. The question is whether either of those decisions should be disturbed, and our answers are resounding absolutely not. All right. So let's start with the first one. What rates was JustPlay operating under when it shipped goods? When it shipped goods, it had rates that had been discussed in June of 2018 orally. There had been a back and forth exchange of communication. What were those rates? Were they the same as the May rates? They were the same as the rates, I believe, in April of 2018. In May of 2018, there was certain changes. Then in January of 2019, there were changes in 2019. That's a problem for you, in my opinion, because if the rates were the same as those set out in the May rate sheet, and you and JustPlay were proceeding on those rates, and you shipped goods without agreeing to anything different, why don't you buy the May rate sheet by shipping the goods? So a few reasons. First of all, they were shipped in essence, if you will. There was not an invoice. There was not a payment rate of any kind. Understood. And there was no bills whatsoever with regard to those rates? Understood. But you had a rate sheet telling you. It's crazy to me that a company like JustPlay would have shipped goods without an understanding of what the services were on FITSMARK's side and what the payment obligations were on JustPlay's side. Those are the two sides of the contract coin. So you knew what FITSMARK had promised to do, and FITSMARK had to know what you had promised to pay. And if you promised to pay what the May rate sheet said, how did you not accept that rate sheet? Well, for a few different reasons. The first one is Mr. Carter testified a deposition that he said multiple times orally and in writing that he would not sign the agreement. And it's very clear that the parties understood that there was no agreement reached absent a sign. But he never said he never said that he wouldn't sign it because of the policy. And he never said he wouldn't sign it because he disagreed with the terms. And it turns out from all of the internal discussion at JustPlay that the reason he wouldn't sign it is because JustPlay had an internal corporate policy to not sign written warehousing agreements. But he's asking for a rate lock extension. If you have a rate lock extension, you have to have a rate that you're extending. And if that rate is the May rate... But the rate lock extension was for certainty, and I think it's very important to understand that with respect to this initial run, what we'll call this October, this was a test run. This was a very small amount of products that were specifically designated. So this was a situation in which there was going to be a change and a real decision made after the test run, and that was all the testimony. And respectfully, Your Honor, I believe that the suggestion of the fulsome conversations and the context within which Mr. Carter testified that he advised that there would be no oral agreement is an inference that he made those statements after in October of 2018, after the tender, which is not an inference which I believe can be drawn in their favor. So here's what I think, this is the impression I get. You want to buy the services set forth in the May rate sheet. You want to buy or accept the rates set forth in that rate sheet, but you don't want to buy the limitation of liability set forth in that May rate sheet. Well, there's a couple... That seems odd. Well, there's a couple of things. What services were going to be provided was not set forth in the May rate sheet. There were services provided in there, but the record is full of testimony regarding the promises that were made specifically, orally, and between the parties. And the comment that Mr. Borchardt was not involved in contract formation is incorrect. The testimony was that Mr. Borchardt, along with Mr. Carter, were meeting with Fitzmark, and that there were a number of communications which occurred in which there were promises made with regard to very specific items with regard to 3PL warehouse services. And so... When Fitzmark made those promises? Yes. What did JustPlay agree to pay for those promises? They did not agree to pay specific amounts, for example, at that moment to not store things on the floor. It was part of the overall agreement. No, no, no, no. Fitzmark says, orally, as you indicate, Fitzmark says, okay, you're going to do this test run. We're going to provide these services, right? Yes. And JustPlay says, great, that's what we're looking for. Correct. Right so far? Yes. Fitzmark asked JustPlay, how much are you going to pay for these services? JustPlay has to agree to something, right? What did JustPlay agree to? They agreed to rates that were put forth originally, I believe, in an April 2018 communication, as well as thereafter in a May communication. But what's important to understand is that the actual document was rejected in a May 15th communication when they say fill your space. And I believe that the panel was completely on the right track when it was saying, how can there be a contract formed in June of 2018, which is what was testified to? How can there be a contract that binds the parties to these written contract terms in By Fitzmark's own contention, there wasn't until acceptance by tender. And well, when do you think a contract was formed? Well, the jury disagreed with us, but we believe that an oral agreement was reached in June of 2018, which did not incorporate any of those terms whatsoever. Those terms were not part of the discussions. He said- They didn't incorporate the rates either? You just told me that they agreed to the rates in the May sheet. I apologize, Your Honor. They agreed on some basic rate amounts, as well as the services provided. But this is the question of whether or not the parties agreed to all of the terms set forth which Fitzmark is seeking to bind here. And the course of conducts of the parties makes it absolutely clear that they did not, not the least of which is the payment through the lifetime of this relationship in the ordinary course before it all fell apart of charges which they are seeking are categorically barred. The chargebacks, the gemurrage charges, those were fees that were paid in the ordinary course by Fitzmark, which are not permitted under Fitzmark's reading. Similarly with regard- Can you explain that? Absolutely. There were, there's quite a substantial amount of evidence that's in the record regarding the consequential damages. Fitzmark's contention is that their warehouse agreement bars consequential damages altogether. But what we see is that, and particularly in Appendix Tab 4, Mr. Gorolla testified that Fitzmark agreed to pay chargebacks. And so there were chargebacks just in the ordinary course of this business where, for example in this case, it was coals. If product isn't delivered either timely or if product isn't delivered in the manner with the labels put in which the customer requests, there are chargebacks, there are fees for that. So these types of damages are damages which Fitzmark says cannot be paid and cannot be sought under their agreement. All of those you think are consequential? Well, they- Some of them are for services not provided, right? Some of the- Some of the chargebacks are for services not provided. No, they're relating to the labeling being put in the wrong way. Right. For services not provided. But the products were received. So this isn't a question of the product- But it's just not the product being received. That's part of the service that Fitzmark is providing. According to your theory of the case, Fitzmark agreed to not only warehouse the product, but also keep it on the floor, not put it on the higher levels, have this automated labeling system, et cetera. So if Fitzmark doesn't provide a service, then JustPlay isn't required to pay for the service and that's why you get the chargeback. I apologize. I think that there's a disconnect. The chargeback is not between Fitzmark and JustPlay. It's from a third party. The customer of JustPlay issues a chargeback to JustPlay. Kohl's charges JustPlay for not complying with that agreement. JustPlay turns around and says, Fitzmark, we have to pay Kohl's now. These charges that have been caused by this noncompliance- I understand. Okay. And then Fitzmark pays them. That happened with Kohl's? That happened with Kohl's. Did it happen with the Walmart half a million or no? It did. There was different- They didn't pay the 500, just to be clear, the chargeback of $550,000. They did not voluntarily pay that. That was not a voluntary payment. But it wasn't just simply one chargeback. Mr. Borchert testified that Fitzmark accepted responsibility for paying chargebacks. And said specifically, if you will, there's an email evidence where in May of 2019, Mr. Carter asks Fitzmark to cover another chargeback. And Mr. Garola's response is, no problem, yes, we will cover. Those types of charges are exactly what they're saying you could never receive under this agreement. It's not limited there. The demerge charges. Fitzmark also paid demerge fees resulting from its failure to timely retrieve products from the port. Again, damages, Fitzmark says, are barred by the contract. And they were paying them several times throughout the life of this relationship. And of course, we know that Mr. Garola testified on two different occasions, two different manners, that this May contract did not govern the relationship of the parties. And fundamentally, at a very minimum, it creates a factual jury question. And what Fitzmark is asking for here is that all inferences be drawn in its favor on all of the law, all of the facts presented, and that this court overturn, which is not permitted under this court's ruling at EEOC. Let me ask you, I think that you put your, so at the trial level, you argued there was an oral contract. Correct. They argued there's an express written contract. The jury came back and said, neither one of you is right. There is no contract. What is the evidence in the record? Why did the jury, looking at the case in the light most favorable to you, as we have to, why did the jury come back and say, both sides are wrong, there is no contract? First of all, I believe that part of the, they found that there were promises, and they found that there was, you know, they found all of the elements of promissory estoppel. I think this is really the textbook promissory estoppel case, where they find- Oh, but step one has to be, I mean, you know, the judge instructed the jury, if there's a contract, you don't get to promissory estoppel. And so I guess my question is, I don't think we're really there yet, but on step one, which is, is there a contract? Why did the jury say step one, no contract? I think the jury found that there was no meeting of the minds, that there was an agreement, that there was promises that were going to be made, that there was going to be payment in response, and there were certain things that had to be done. And we relied on those promises. But the idea that each party had a contract, I don't think that the jury bought from a formation standpoint, and certainly they rejected the written contract that was put forward by Fitzmark twice, both as an affirmative defense and with respect to being bound. And so I think it's very important to recognize when we look at the evidence that supported the elements of promissory estoppel, that putting aside the actual form, that actual document, there is- the evidence is replete of promises made beginning in January of 2018, what was discussed as far as the needs, the testimony where JustPlay specifically described its needs and expectations, and the representations and promises consistently being made regarding Fitzmark saying that it will do it. And when we think about this also, I think it's important to understand who had the motivation here. Who wanted this business? Fitzmark wanted this business. JustPlay had an existing warehouse provider with which it had no such agreement, was not bound by any such terms. The inference would have to be that they were going to put themselves in a significantly worse position for what motivation? And there was no suggestion that Mr. Carter was motivated for that purpose. And this case would be a lot cleaner, of course, had somebody from JustPlay just said to somebody at Fitzmark, we are not signing an agreement with these liability limitations. Nobody did. There's nothing in the record that indicates that anybody said that. No, Mr. Carter testified that he said we are not signing the agreement. Right. But that could be for- because of the internal policy to not sign written warehouse agreements, or it could be because you disagree with some of the substance in terms of the rate sheet. And that's an inference to which we are entitled to the benefit at this juncture. And also, if they were going to enforce these written provisions, it would have to be a written agreement. And I just do want to touch, and I'm, of course, happy to answer any more questions. How much of an argument about promise or estoppel is made in the opening statements and closing arguments? There are at least a dozen times when the promises- the entire opening statement was basically about promises. This was a case about promises and the promises that were made. There's no question that promise or estoppel was an alternative theory. But separate and apart from any contractual discussion, there was a- there was multiple record evidence of the promises made throughout 2018 about the capabilities and even thereafter. The only other thing I wanted to just briefly call the attention to of the panel was the jury instruction, which simply states every bit of that jury instruction models the pattern rules of the jury instructions, with the exception of the one bracketed area, which the instruction says, quote, describe subject matter of alleged promise. What Fitzmark would like us to do here is to rewrite the model jury instructions and make that require list out detailed every promise from the complaint or something of the like. And, Your Honors, that would be at odds with the, quote, describe subject matter of alleged promise and at odds with the 11th Circuit deference awarded to the jurist- excuse me, the district court. I'm happy to answer any other questions. Thank you so much, Your Honors. Thank you, Ms. Vasquez. Ms. Painter, you've reserved some time for rebuttal. Thank you, Your Honors. I want to address two things briefly. The first is the standard, and this case had me thinking a lot about inferences and what inferences are reasonable and what inferences aren't reasonable, and I thought surely there's law in that. And it turns out that there is. In Bald Mountain Park v. Oliver, which is found at 863 F. 2nd, 1560, the Penn site's 1564, and that's this court, this court explained that when circumstantial evidence can't support an inference, and it said, a fact that may be inferred but not demanded by circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists. The October 31st email exchange is positive and uncontroverted evidence that Mr. Carter never told Fitzmark that there was a policy against entering written agreements because when you look at the email exchange, Mr. Carter says, I want the agreement. He didn't say, what are you doing asking me to sign this agreement? I told you months and months ago we don't have this policy. And then he says, I will explain. He says, I think for the first time, my guys don't like signing agreements. I will explain. So that email demonstrates that prior to acceptance by tender, there was no express rejection, which just plays the entire argument. Second point, the demurrage and the chargebacks and the things that Ms. Pallett-Vasquez discussed weren't paid in the ordinary course. They were paid occasionally upon request, their business partners. I don't think any, there's no question, but that my client wanted the business relationship to be successful. And so when they were asked to accommodate a request, my client did it. That doesn't void a contract ab initio that's already been formed. Third, promissory estoppel. And I think, Judge Brasher, you were getting to this a little bit. There are promises, right? Contract formation is this, offer acceptance consideration. Here we said, look, we're making this offer, written or not, we're making this offer. They said, we're going to accept it. We're going to deposit goods. There's no question, but that ultimately, Fitzmark was the warehouse man in this situation. They deposited goods. They deposited goods presumably with the understanding of what they were going to be paying for the services that my client provided. So there's no question about consideration. There's no question about offer. There's, I mean, maybe there's not acceptance, but that doesn't mean that there's promissory estoppel that exists. And I apologize, I misspoke because there certainly was acceptance. They sent the products in and they sent the product in with the expectation that they were going to have to pay for it. So it's unclear to me how the jury could conclude that there was no oral agreement because presumably the terms weren't clear enough for it to conclude that there was an oral agreement. But then on an even higher standard, a substantial indefinite promise, which is what's required by Florida law. Part of the problem may be that if your opponent is right, the May rate sheet didn't completely encompass all of the services that FITS Mark ultimately agreed to provide. Is that accurate? The only service that's not. By the time, by the time that Just Play delivered or had goods delivered to FITS Mark, the services that FITS Mark had agreed to provide had expanded beyond what those set out in the May rate sheet. That's at least a suggestion. Is that wrong? That's incorrect. So the services that FITS Mark agreed to provide are listed on the first page of the rate sheet. And they didn't provide any others? The only promise that Just Play points to that's not specifically listed in the rate sheet is to store products on the floor. Everything else is listed. Including the technology stuff that Mr. Garula testified to? Yeah, that's contained in that outbound handling. So the EDI, the electronic data interchange, that's part of the labeling process. That's part of the outbound handling process. So it's included in those activities. As to the final point with respect to operating under the terms of the agreement, I would just point out that when my client asserted its warehouseman's lien, which it could not do under Florida law without a written agreement, Just Play didn't file an action to replevee. They didn't try to replevee the goods. They said, okay, I'll pay the lien to get the goods back. Both parties acted like the written contract was in place. And for those reasons, we'd ask that you reverse the district court and remain with instructions in your judgment for FITS Mark. All right. Thank you, counsel. Court is adjourned.